**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-01290-SKC

TROY ANDERSON, *individually and, as to
Count VII only, on behalf of a CLASS of
similarly situated persons*,

      Plaintiff,

v.

COLORADO DEPARTMENT OF
CORRECTIONS;
DEAN WILLIAMS;
WILLIAM LITTLE;
STEVE OWENS;
JAMES FALK;
SCOTT DAUFFENBACH;
KATHLEEN BOYD, P.A.;
MS. BLATNICK, HSA;
DAYNA JOHNSON, HSA;
DR. WESTCOTT;
DONALD NUNEZ;
CAPTAIN KIRK;
CAPTAIN HAWKINS;
CAPTAIN SHIELDS;
LIEUTENANT CORBIN;
LIEUTENANT JOHNSON;
LIEUTENANT HAGANS;
SERGEANT KYLE MILLER;
SERGEANT CRANE;
BERNDT REED;
OFFICER MASONCUP;
OFFICER EVERINGTON HOWELL;
THOMAS FOX, MHS;
HEADQUARTERS;
UNKNOWN INDIVIDUALS AT LCF;
UNKNOWN OFFICERS WHO
EFFECTUATED TRANSFER;
and UNKNOWN INDIVIDUALS AT BVCF,
*in their individual and official capacities.*

      Defendants.

1

## SECOND AMENDED COMPLAINT AND JURY DEMAND

### PRELIMINARY STATEMENT

Plaintiff, Troy Anderson, an inmate under the custody and care of the Colorado Department of Corrections ("CDOC"), files this Second Amended Complaint ("SAC") for violations of his rights under the First and Eighth Amendments to the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.  Mr. Anderson, who suffers from severe mental illness and has been in CDOC custody for more than two decades, brings this action for injuries suffered as a result of Defendants' substantial and deliberate indifference to his health and safety. Defendants have maliciously deployed excessive force against Mr. Anderson, and consciously disregarded serious known risks to his health and safety by refusing to provide adequate mental and physical health care.  Mr. Anderson seeks damages for Defendants' commission of acts under color of law that deprived him of rights secured by the Constitution and laws of the United States.  Defendants the Colorado Department of Corrections and its officials, management, and employees, have also failed to establish and implement necessary and appropriate security measures with respect to certain housing designations in order to protect Mr. Anderson and other inmates from harm, all in violation of the Eighth Amendment.  Claim Seven, brought on Mr. Anderson's own behalf and on behalf of similarly situated persons pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2), is directed to these issues of personal safety and seeks injunctive and declaratory relief.

## JURISDICTION AND VENUE

1.      This action is filed under the Eighth Amendment to the United States

Constitution, pursuant to 42 U.S.C. § 1983, and other federal law.  The Court has subject-matter

jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

2.      Venue is proper in the District of Colorado pursuant to 18 U.S.C. §1391(b)(2).

## PARTIES

3.      Plaintiff **Troy Anderson** is, and was at all times relevant herein, a citizen of the

United States.  Mr. Anderson has been a prisoner, continuously confined in the Colorado

Department of Corrections ("CDOC") since May 25, 2000.  Mr. Anderson suffers from severe

mental illness that substantially limits his major life activities, including but not limited to

thinking, learning, concentrating, and interacting with others.  Mr. Anderson has a record of such

impairments and is regarded by CDOC as having such impairments.  He is currently incarcerated

at Colorado State Penitentiary ("CSP"), 50 Evans Rd., Cañon City, CO 81212.

**Colorado Department of Corrections**

4.      Defendant **Colorado Department of Corrections** ("CDOC") is a department of

the State of Colorado.  As such, Defendant CDOC is a public entity as that term is used in Title

II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*.  Defendant CDOC is also a

recipient of federal financial assistance as that term is used in Section 504 of the Rehabilitation

Act, 29 U.S.C. § 794.

5.      Defendant **Dean Williams** is the Executive Director of CDOC, a position held by

Rick Raemisch for the bulk of the time relevant to this action.  The CDOC Executive Director is

responsible for the custody and care of Mr. Anderson and all prisoners in CDOC.  Defendant

Williams oversees all employees in CDOC, and has authority to establish, alter, and implement

all policies and procedures within CDOC.

6.      Defendant **Headquarters** ("HQ") refers to unknown individuals at CDOC who made decisions or issued orders about Mr. Anderson's mental health care, medical care, and transfers between CDOC facilities, including but not limited to, on information and belief, Dr. Jill Lampela.  Dr. Lampela was, until 2016, the Chief of Behavioral Health at the Colorado Department of Corrections ("CDOC"), 10900 Smith Rd., Denver, CO 80239.  On information and belief, after that time Dr. Lampela joined CDOC Headquarters and is currently the CDOC Director of Medical and Clinical Programs.  On information and belief, at all times relevant to this action, Dr. Lampela participated in overseeing CDOC's mental health programs, including any provision of mental health care to Mr. Anderson.  Plaintiff will obtain the names of the remaining individuals comprising Headquarters through pretrial discovery.

**Buena Vista Correctional Facility**

7.      Defendant **Thomas Fox**, at all times relevant to this action, was a Mental Health Supervisor ("MHS") at Buena Vista Correctional Facility ("BVCF"), 15125 US-24, Buena Vista, CO 81211.  MHS Fox supervised Mr. Anderson's mental health care at BVCF.

8.      Defendant **Dayna Johnson**, at all times relevant to this action, was the Health Services Administrator ("HSA") at BVCF, 15125 US-24, Buena Vista, CO 81211.  HSA Johnson, among others, was responsible for providing Mr. Anderson with mental health care and responding to his requests for care.

9.      Defendant Officer **Everington Howell**, at all times relevant to this action was a Corrections Officer at BVCF, 15125 US-24, Buena Vista, CO 81211.  Officer Howell was responsible for overseeing the safety of BVCF inmates.

4

10.     Defendant **Captain Shields**, at all times relevant to this action was a Corrections Officer at BVCF, 15125 US-24, Buena Vista, CO 81211.  Captain Shields was responsible for overseeing the safety of BVCF inmates.

11.     Defendants **Unknown Individuals at BVCF** refers to unknown individuals who received, read or otherwise knew about and ignored Mr. Anderson's May 10, 2018 letter warning that Mr. Anderson and his cellmate were in danger ("5-10-18 Letter of Warning of Danger"). The actual identities of all such defendants are unknown to Mr. Anderson at the present time.  He will obtain the names of these individuals through pretrial discovery.

**Colorado State Penitentiary**

12.     Defendant **Warden William Little** is the current Warden at CSP, 50 Evans Rd., Cañon City, CO 81212.  Warden Little is responsible for the safe operations of CSP and the supervision of all prison personnel.  With regard to plaintiff's claim for injunctive relief, Warden Little has an obligation under law to ensure, among other things, that inmates are protected against unprovoked assault by other inmates.

13.     Defendant **Steve Owens**, at most times relevant to this action, was the Warden at CSP, 50 Evans Rd., Cañon City, CO 81212.  During his tenure as warden, Warden Owens was responsible for the safe operations of CSP and the supervision of all prison personnel.  Defendant Owens is currently Deputy Director of Prisons.  In that role, he supervises the current wardens of six CDOC facilities, including CSP Warden Thomas Little, and oversees the Office of Offender Services in which the Central Classification Committee, described below, is housed.

14.     Defendant **Kathleen Boyd** is a Physician's Assistant at CSP, 50 Evans Rd., Cañon City, CO 81212.  Ms. Boyd is responsible for providing medical care to CSP inmates.

15.     Defendant **Lieutenant Johnson**, at all times relevant to this action, was a Corrections Officer at CSP and member of Intelligence / Gang Unit, 50 Evans Rd., Cañon City, CO 81212.  As a corrections officer, Lieutenant Johnson was responsible for overseeing the safety of CSP inmates.

16.     Defendant **Lieutenant Hagans**, at all times relevant to this action, was a Corrections Officer at CSP and member of Intelligence / Gang Unit, 50 Evans Rd., Cañon City, CO 81212.  As a corrections officer, Lieutenant Hagans was responsible for overseeing the safety of CSP inmates.

17.     Defendant **Major Donald Nunez**, at all times relevant to this action, was a Corrections Officer at CSP, 50 Evans Rd., Cañon City, CO 81212.  As a corrections officer, Major Nunez was responsible for overseeing the safety of CSP inmates.

18.     Defendants **Unknown Officers who Effectuated Transfer** refers to unknown individuals who authorized and administered Mr. Anderson's transfer from CSP to Montana State Penitentiary in December 2018.   The actual identity of each such defendant is unknown to Mr. Anderson at the present time.  Plaintiff will obtain the names of these individuals through pretrial discovery.

**Colorado Territorial Correctional Facility**

19.     Defendant **Sergeant Crane**, at all times relevant to this action, was a Corrections Officer at Colorado Territorial Correctional Facility ("CTCF"), 275 US-50, Canon City, CO 81215.  As a corrections officer, Sergeant Crane was responsible for overseeing the safety of CTCF inmates.

**Fremont Correctional Facility**

20.      Defendant **Scott Dauffenbach**, at most times relevant to this Complaint, was the

Warden at Fremont Correctional Facility ("FCF"), 600 Evans Rd, Cañon City, CO 81212.

During that time, Defendant Dauffenbach was responsible for the safe operations of FCF and the

supervision of all prison personnel.  Defendant Dauffenbach is currently Assistant Director of the

Office of Offender Services, which houses the Central Classification Unit and Central

Classification Committee..

21.      Defendant **Captain Kirk**, at all times relevant to this action, was a Corrections

Officer at FCF, 600 Evans Rd, Cañon City, CO 81212.  As a corrections officer, Captain Kirk

was responsible was for overseeing the safety of FCF inmates.

**Limon Correctional Facility**

22.      Defendant **Blatnick**, at all times relevant to this action, was an HSA at Limon

Correctional Facility ("LCF"), 49030 CO-71, Limon, CO, 80826.  HSA Blatnick, along with

others, supervised Mr. Anderson's mental health care at LCF.

23.      Defendant **Berndt Reed**, at all times relevant to this action, was a Mental Health

Supervisor ("MHS") at LCF, 49030 CO-71, Limon, CO, 80826.  MHS Reed, among others, was

responsible for providing Mr. Anderson with mental health care and responding to his requests

for care.

24.      Defendant **James Falk**, at most times relevant to this action, was the Warden at

Limon Correctional Facility ("LCF"), 49030 CO-71, Limon, CO, 80826.  Warden Falk was

responsible for the safe operations of LCF and the supervision of all prison personnel.  Formerly

the Warden of Sterling Correctional Facility in 2014 and 2015, when Mr. Anderson was housed

there, Warden Falk participated in settlement discussions involving the "2010 Action," described below.

25.     Defendant **Captain Hawkins**, at all times relevant to this action, was a Corrections Officer at LCF, 49030 CO-71, Limon, CO, 80826.  As a corrections officer, Captain Hawkins was responsible for overseeing the safety of LCF inmates.

26.     Defendant **Officer Robert Masoncup**, at all times relevant to this action was a Corrections Officer at LCF, 49030 CO-71, Limon, CO, 80826.  Officer Masoncup was responsible for overseeing the safety of LCF inmates.

27.     Defendant **Sergeant Kyle Miller**, at all times relevant to this action was a Corrections Officer at LCF, 49030 CO-71, Limon, CO, 80826.  Sergeant Miller was responsible for overseeing the safety of LCF inmates.

28.     Defendant **Lieutenant Corbin**, at all times relevant to this action, was a Corrections Officer at LCF, 49030 CO-71, Limon, CO, 80826.  As a corrections officer, Lieutenant Corbin was responsible was for overseeing the safety of LCF inmates.

29.     Defendant **Dr. Westcott**, at all times relevant to this action, was a physician at LCF, 49030 CO-71, Limon, CO, 80826.  In this capacity, Dr. Westcott was responsible for providing medical treatment to LCF inmates, including Mr. Anderson.

30.     Defendants **Unknown Individuals at LCF** refers to unknown individuals at LCF who witnessed or participated in the assault of Mr. Anderson in his cell, on July 24, 2018, at LCF, 49030 CO-71, Limon, CO, 80826.  The actual identity of all such defendants is unknown to Mr. Anderson at the present time.  Plaintiff will obtain the names of these individuals through pretrial discovery.

## NATURE OF THE CASE

31.     From the time he was a young child, Mr. Anderson has suffered from a severe

mental disability, which prevents him from performing major life activities, such as learning and

interacting with others, and which causes him to have mood swings, severe depression, and

episodes of impulsive behavior.  Multiple CDOC mental health providers have diagnosed Mr.

Anderson with a range of mental health disorders over the span of many years.  Mr. Anderson

cannot function properly absent adequate treatment and accommodations.

32.     Although Defendants are aware of Mr. Anderson's mental health needs, they have

failed to provide him constitutionally adequate mental health care and have discriminated against

Mr. Anderson because of his disability.  In fact, although courts in this district have repeatedly

found Mr. Anderson's condition to constitute a serious medical need under the Eighth

Amendment, Defendants have determined that Mr. Anderson does not suffer from a "major

mental illness."  As a matter of CDOC policy, this means that Mr. Anderson is ineligible for a

range of benefits, treatment, and accommodations available to inmates suffering from serious

mental illness.

33.     Defendants are excluding Mr. Anderson from programs and activities, denying

him privileges afforded to nondisabled prisoners, and otherwise discriminating against him based

on conduct that is a direct result of his disability and/or based on Defendants' perception of him

as disabled and/or his history of disability, while at the same time denying him access to the

treatment that would permit him to control that conduct.  Defendants include the former wardens

of CSP, FCF, and LCF, as well as Headquarters (collectively the "Supervisory Defendants"),

who were responsible for implementing CDOC's policies regarding mental health care and

personally participated in decisions to provide (or not) mental health care to Mr. Anderson.

Among other things, the Supervisory Defendants placed non-mental health care providers in

charge of providing care to Mr. Anderson and either failed to supervise or deliberately assented to their failure to provide adequate care to Mr. Anderson.  As a result of this conduct and discrimination, Mr. Anderson has been denied access to work, visitation, recreation, food trays, and other programs and activities.

34.     Among the programs and activities to which he is being denied access are those that would give him the tools necessary to progress out of Colorado State Penitentiary, Colorado's "supermax" facility, and to reduce the length of his sentence.  Defendants' discrimination thus has the effect of relegating Mr. Anderson to Colorado's highest security facility and prolonging his sentence.  CDOC staff has also physically assaulted Mr. Anderson because of his repeated requests for adequate mental health treatment and/or because of what CDOC perceives as disruptive behavior stemming from his mental illness.  Mr. Anderson seeks to have his mental health needs treated appropriately, and to be free from physical violence stemming from his illness.  He is entitled to the reasonable accommodation of his conditions.

35.     With appropriate treatment, Mr. Anderson may be able to earn his way out of CSP to a facility in which he would have access to programs that may allow him to reduce his sentence through good behavior and completion of therapeutic and rehabilitative programs.  He may also be able to reintegrate into normal prison life, and learn to function normally.  CSP inmates, however, do not have the same level of access to these programs, even with good behavior.  Mr. Anderson does not have a life sentence.  But his retention at CSP without access to adequate mental health care effectively ensures that he will die in prison.

36.     Although Mr. Anderson has been transferred to and from multiple CDOC facilities within the last five years, with one short-lived exception, he has been housed at CSP since August 2018.  Throughout most of that time, Mr. Anderson has been housed in what

inmates call "specialized," "specific," or "security" housing, and primarily refer to as "Soft Housing." In practice, CSP officials treat Soft Housing as an alternative to, or overflow for, "Protective Custody" (or "P.C."), which is a formal housing designation used to remove at-risk prisoners from the general population for their own safety. CSP does not have "P.C." facilities. On information and belief, it is the only CDOC facility that uses "soft" units as an alternative.

37.     Inmates placed in Soft Housing do not receive the same protections as those in Protective Custody. Inmates can be removed from Soft Housing at any time, for example, transferred to the general populations of CSP or another facility. Soft Housing also offers no anonymity: other inmates at CSP and—because this information carries—other CDOC facilities are aware of which inmates are located in Soft Housing at any given time.

38.     It is widely believed among CDOC inmates that those held in Soft Housing are informants, weak, or easy targets for assault by virtue of having been placed in Soft Housing. This fact is well known to Defendants. Upon their release into the general population, whether at CSP or elsewhere, inmates who have been held in Soft Housing are routinely assaulted by other inmates. This fact, too, is well known to Defendants. Mr. Anderson was targeted for assault after his last stint in Soft Housing. And before CDOC returned him there in August 2018 (over Mr. Anderson's protests), a notorious gang leader told Mr. Anderson that he would be assaulted or killed if he ever returned to Soft Housing. Mr. Anderson has been in Soft Housing for more than two years since that time, and firmly believes that if he is placed into the general prison population, he will be assaulted or killed.

39.     Mr. Anderson is not alone in this fear as many if not most other inmates in Soft Housing face the same fate upon their release from the "soft" units. Defendants are well aware of these risks because, among other reasons, CSP inmates, including Mr. Anderson, routinely file

11

grievances informing Defendants that they are at risk of being assaulted because of their placement in Soft Housing.  Yet, consciously disregarding this substantial and known risk, Defendants have failed to take any action to protect inmates from assault (or worse) after they are released from Soft Housing.  As a result, veterans of CSP Soft Housing are assaulted across CDOC facilities.  Mr. Anderson will suffer the same fate if and when he is transferred out of Soft Housing without appropriate oversight.

40.    Accordingly, Mr. Anderson brings Claim Seven on his own behalf and on behalf of similarly situated CSP inmates to oblige CDOC to take measures to protect him and other inmates from known risks of assault at the hands of other inmates.  Claim Seven is a class claim brought pursuant to Federal Rule of Civil Procedure 23 for purposes of obtaining injunctive and declaratory relief.  This action satisfies all four requirements of Rule 23(a), in that (1) the class includes scores of CSP inmates; (2) there are questions of law and fact common to the class regarding, for example, CDOC's use of Soft Housing and the extent to which inmates are at risk from unprovoked assault due to Defendants' deliberate indifference; (3) the claims of Mr. Anderson are typical of the claims of the class, namely Defendants have turned a blind eye to the need to protect Mr. Anderson from assault by other inmates; and (4) Mr. Anderson and his court-appointed counsel will fairly and adequately protect the interests of the class.

## FACTS

### A.  Mr. Anderson has an extensive history of serious mental illness that has profoundly affected his ability to function in life.

41.    Mr. Anderson has had mental health problems throughout his life.  Outside a proper therapeutic setting, Mr. Anderson is not able to control his emotions and anger, which has resulted in family dysfunction and Mr. Anderson being incarcerated for most of his adult life.

42.     This long history of mental illness is a matter of court record.  Courts in this district have held that it constitutes a serious medical need under the objective prong of the Eighth Amendment inquiry.  Nov. 3, 2019 Order, at 11, Dkt. 21; *see also* Case No. 10-cv-01005-RBJ-KMT, Mar. 26, 2012 Order, at 9, Dkt. 80; Case No. 16-cv-02113, 8 Aug. 21, 2017 R&R, at 17, Dkt. 47.

43.     On March 20, 2000, Mr. Anderson was convicted of charges related to menacing and attempted murder in connection with attempts to escape from the police.  Adams County Judge Richter, in his recommendations at Mr. Anderson's sentencing on March 20, 2000, advised CDOC that Mr. Anderson needed mental health services and recommended he be sent to San Carlos Correctional Facility ("SCCF") to be evaluated and given such services as part of his sentence.  Mr. Anderson has been in custody continuously since that time—for more than 20 years.[1]

44.     Over the course of his imprisonment, Mr. Anderson became involved in prison gang activity.  He is a former member of a gang that later merged with the 211 prison gang ("211 gang").  He disassociated from his former gang in 2011, and no longer has any gang involvement or affiliations.

---

[1]     Within the last five years alone, Mr. Anderson has been incarcerated at six different CDOC facilities. From 2016 to July 2017, Mr. Anderson was incarcerated at Fremont Correctional Facility ("FCF").  From July 2017 to August 2017, Mr. Anderson was incarcerated at Colorado Territorial Correctional Facility ("CTCF"). From August 2017 to February 2018, Mr. Anderson was incarcerated at Colorado State Penitentiary ("CSP"). From February 2018 to March 2018, Mr. Anderson was incarcerated at CTCF.  From March 2018 to June 2018, Mr. Anderson was incarcerated at Buena Vista Correctional Facility ("BVCF").  In June 2018, Mr. Anderson was briefly incarcerated at Sterling Correctional Facility ("SCF") then transferred to Limon Correctional Facility ("LCF") until August 2018.  From August 2018 to present, Mr. Anderson has been incarcerated at CSP except for a brief transfer to Montana State Penitentiary ("MSP") from December 11, 2018 to December 27, 2018.

**B. Prior litigation resulted in various mental health evaluations and treatment plans.**

45.     On May 3, 2010, Mr. Anderson initiated civil action 10-CV-01005-RBJ-KMT (the "2010 Action") against CDOC and other individual defendants.  The 2010 Action alleged, among other things, that:  (1) CDOC was deliberately indifferent in violation of the Eighth Amendment in failing to provide Mr. Anderson with appropriate mental health treatment, namely prescription medication and multidisciplinary treatment; and (2) the conditions of Mr. Anderson's confinement, including spending 12 years in Administrative Segregation ("AD-SEG"), a 23-hour lockdown unit without direct sunlight or interaction with other inmates, violated the Eighth Amendment.

46.     As to the first claim, following a bench trial, the Court held that although Mr. Anderson is "absolutely entitled to necessary and effective mental health care under the Eighth Amendment," Defendants had not been deliberately indifferent to Mr. Anderson's mental health needs with respect to the issues raised at trial.  *Anderson v. Colorado, et al.*, 887 F. Supp. 2d 1133, 1148 (D. Colo. 2012).  The Court did order, however, that defendants assign a CDOC physician without previous contact with Mr. Anderson to take a fresh look at his medication and treatment needs.  *Id.* at 1157.

47.     In September 2012, Dr. Shepard, a CDOC psychologist, conducted the court-ordered diagnostic evaluation.  He diagnosed Mr. Anderson with the following mental health conditions:  combined type Attention Deficit Hyperactivity Disorder ("ADHD"), aggressive type Generalized Anxiety Disorder ("GAD"), Intermittent Explosive Disorder ("IED"), Depression, Borderline Personality Disorder ("BPD"), and Antisocial Personality Disorder ("ASPD") (together, "CDOC Diagnoses").  Dr. Shepard's re-evaluation resulted in a treatment plan that ordered a prescription for Ritalin, Offenders with Mental Illness ("OMI") monitoring, and

14

continued psychotherapy, including: "1:1 Cognitive Behavioral Therapy" and "Dialectical Behavioral Therapy" (the "CSP Mental Health Treatment Plan").  The CSP Mental Health Treatment Plan confirmed that Mr. Anderson requires a two-prong approach:  medication therapy and collaborative psychotherapy.

48.     In June 2014, Dr. Bryce Willson, a psychologist at the Sterling Correctional Facility, to which Mr. Anderson had by then been transferred, put in place a detailed multi-disciplinary treatment plan for Mr. Anderson (the "Sterling Mental Health Treatment Plan," collectively with the "CSP Mental Health Treatment Plan," the "CDOC Treatment Plans").  In addition to "OMI Monitoring sessions," and "psychiatric clinic appointments," the Sterling Mental Health Treatment Plan also prescribed collaborative therapy, which may include "cognitive behavioral choice theory," "DBT interventions," "and other efficacy based treatment interventions deemed effective in addressing the clinical presentation of this inmate's Axis II Cluster B traits."  The Sterling Mental Health Treatment Plan also set forth in detail the aspects of treatment on which these clinical modalities should focus, and prescribed a multi-disciplinary treatment team to "address[] [Mr. Anderson's] gradual progression into general population."

49.     Pursuant to the Sterling Mental Health Treatment Plan, CDOC convened a multi-disciplinary staff meeting in July 2014, and, for a short period of time, Mr. Anderson received adequate, multidisciplinary mental health treatment.  During this time, Mr. Anderson's behavior and mental health condition improved.  Mr. Anderson had progressed out of administrative segregation, and appeared to be making some progress toward rehabilitation.

50.     Concerned that CDOC might not continue to provide these services to him in the future, Mr. Anderson asked the Court to amend its final judgment in the 2010 Action to require CDOC to comply with the Sterling Mental Health Treatment Plan.  Although the Court declined

to do so, it noted that CDOC's implementation of the Sterling Mental Health Treatment Plan satisfied its concern that Mr. Anderson receive care according to the advice of mental health care professionals. *See* Order, at 4–5, 9, 10-cv-01005-RBJ-KMT (Apr. 7, 2015), Dkt. 188. The Court observed that Mr. Anderson "has been prescribed the medication he sought for his mental illness, and he is receiving acceptable, multidisciplinary mental health treatment." *Id.* at 9.

51.     The diagnoses and treatment regimens set forth in the CDOC Treatment Plans remain the operative diagnoses and indicated courses of treatment for Mr. Anderson's mental health conditions.

> **C. Defendants intentionally caused the provision of adequate mental health care to break down and disappear at Fremont Correctional Facility and thereafter.**

52.     Mr. Anderson arrived at FCF in 2016. The warden of the facility at the time, Warden Lou Archuleta, helped to implement the CDOC Treatment Plans.

53.     Because Mr. Anderson suffers from paranoia and anxiety, conditions exacerbated by his many years in solitary confinement, the plan focused on slowly re-socializing him with the rest of the prison population. It included the following measures: (1) food trays so that Mr. Anderson would not have to go to the facility's crowded mess hall for meals; (2) a medical pass so Mr. Anderson could obtain his prescriptions without standing in a line with other inmates; (3) socialization time, during which Mr. Anderson could sit in a chair (called a de-escalation chair) while one or two approved prisoners sat with him and talked with him, to help him slowly become more comfortable with other people; and (4) a 20-minute weekly meeting with a multi-disciplinary treatment team.

54.     On or about March 12, 2017, in connection with his treatment, Mr. Anderson submitted a Request for Accommodations under the Americans with Disabilities Act ("ADA")

(RFA# 11496).  On or about April 21, 2017, CDOC approved certain accommodations for Mr.

Anderson relating to (1) work schedule; (2) eating and medicine; (3) housing; and (4) recreation.

Specifically, he was approved to:  work as an "outside porter for LU2," which allowed Mr.

Anderson to use the de-escalation chair; eat breakfast in his cell or in the dining hall "with first

pull of CH1," i.e., when the dining hall was virtually empty; to retrieve his medicine "with first

pull of CH1," i.e., when the medicine line was as minimal as possible, at both breakfast and

dinner; sit on a grassy or cement area in view of staff for de-escalation purposes; be housed with

a particular inmate who Mr. Anderson knew since childhood, who he trusted, and who agreed to

help Mr. Anderson re-integrate (George Chavez, CDOC # 86421); recreate at certain times and

attend the library at a specified time "with [Removal from Population] offenders only," which in

practice meant that Mr. Anderson could use the library alone because RFP offenders did not, in

practice, use the library.  The approval of Mr. Anderson's ADA accommodations request (Doc.

No. 63877) did not specify an end date.

     55.     Warden Archuleta headed Mr. Anderson's multi-disciplinary team at FCF.

Warden Archuleta implemented the plan and took genuine interest in rehabilitating Mr.

Anderson.  As a result of Warden Archuleta's commitment to the two-prong approach to

treatment prescribed in the CDOC Treatment Plans, Mr. Anderson's behavior and quality of life

significantly improved.

     56.     Warden Archuleta retired in April 2017.  Defendant Scott Dauffenbach took

Archuleta's place as FCF Warden, and assured Mr. Anderson that the mental health treatment he

was receiving would continue.  CDOC's policy is "to provide mental health services that are,"

among other things, "oriented towards improvement, maintenance or stabilization of offenders'

mental health, [and] contribute to their satisfactory prison adjustment…."  Mental Health Scope

of Service, CDOC AR 700-03 § I (Dec. 1, 2019).  "[M]ental health services . . . are provided to

DOC offenders by qualified mental health DOC employees and contract workers."  *Id.* § II.

"Mental health services will ensure continuity of care to offenders throughout DOC facilities…."

*Id.* § IV.K.

57.     A member of Mr. Anderson's mental health care treatment team at FCF, Captain

Kirk, conveyed to Mr. Anderson that he believed Mr. Anderson was getting special treatment at

FCF and that he did not agree that Mr. Anderson should receive accommodations for his mental

illness.

58.     On or about July 3, 2017, Captain Kirk—who is not a medical professional—

revoked Mr. Anderson's medical pass and instructed both medical and security staff that Mr.

Anderson could no longer use the pass.  He also changed Mr. Anderson's treatment plan so that

he was no longer permitted to practice socialization with select prisoners.

59.     This revocation of treatment was intentional and was not medically indicated or

ordered by a mental health care professional.  For example, on or about July 5, 2017, Stephanie

Dalton, a Health Services Administrator ("HSA"), instructed staff to reinstate Mr. Anderson's

medical pass.  But two days later, on or about July 7, 2017, Captain Kirk again revoked it,

overriding HSA Dalton's orders.  Captain Kirk also made other unauthorized changes to Mr.

Anderson's treatment plan, including limiting who could use the de-escalation chair.

60.     Shortly after that time, the treatment contemplated in the CDOC Treatment Plans

and the ADA accommodations approved in DOC # 63877 ceased altogether.  Apart from Mr.

Anderson's Ritalin prescription, he no longer received any sort of effective mental health care.

Mr. Anderson went on hunger strike to protest the revocation of his treatment.

61.     On information and belief, in removing Mr. Anderson's care on July 7, 2020 Captain Kirk relied upon an incident that occurred that same day in which it was alleged (incorrectly) that Mr. Anderson assaulted staff.  Mr. Anderson denied wrongdoing, and, following a hearing on July 13, 2017, the conviction was reversed; the case (#180010) was expunged on August 10, 2017.

62.     Pursuant to CDOC policy, "[w]hen an offender is found not guilty or a conviction is reversed on an appeal, the DOC will attempt to restore the offender to the greatest extent practicable all programs, privileges, and assignments lost . . . ."  CDOC AR 150-01 § IV.F(4)(10)(g).  Defendants, including then-Warden Dauffenbach, disregarded that policy and relied upon the dismissed and expunged incident as a basis not only to withdraw Mr. Anderson's mental health treatment, but also to transfer him from medium custody at FCF to close custody at CSP shortly after that time.[2]

### D. The Supervisory Defendants are personally involved in the provision of mental health care to Mr. Anderson, and caused others to deprive Mr. Anderson of constitutionally adequate mental and physical health care.

63.     Defendants HQ (the individuals at CDOC who made decisions or issued orders about Mr. Anderson's mental and medical health care, including but not limited to Jill Lampela), Scott Dauffenbach (the former FCF Warden), Steve Owens (the former CSP Warden), and James Falk (the former LCF Warden) (collectively the "Supervisory Defendants") were personally involved in implementing and possessed responsibility for the continued operation of CDOC's policies with respect to mental and physical health care.

---

[2]     Close custody is "[t]he highest scored classification custody level within [CDOC]," which is "intended for offenders requiring an increased level of security, supervision, controlled movement and monitored programming."  Special Management, CDOC AR 600-09 (Oct. 1, 2019).

64.     The Supervisory Defendants repeatedly placed non-mental health care providers in charge of the provision of mental health care to Mr. Anderson, and either failed adequately to supervise the provision of that health care or acquiesced in the deliberate failure to provide such care.  And as described in Section E, below, Headquarters directly instructed CDOC personnel to deviate from CDOC policies and medically prescribed or indicated treatment.

65.     After the July 2017 revocation of Mr. Anderson's treatment at FCF, for example, Mr. Anderson met with Warden Dauffenbach to discuss Kirk's actions.  Dauffenbach told Mr. Anderson that he would investigate the issue, ensure that mental health staff reviewed the care he was receiving, and see that appropriate care was reinstated.  Yet Dauffenbach took no action to investigate Kirk's actions or otherwise to ensure that mental health staff reviewed Mr. Anderson's care.  Instead, he knowingly and actively acquiesced to Kirk's actions, and did nothing.  As a result, Mr. Anderson did not receive adequate care and his accommodations were not reinstated.

66.     Later that year, in or about December 2017, and after Mr. Anderson had been transferred to CSP, then-Warden Steve Owens met with Mr. Anderson to discuss his mental health care.  Warden Owens stated that he understood Mr. Anderson needed help, promised to supervise and to be personally involved in Mr. Anderson's treatment, and that a multidisciplinary team would be put in place at CSP.  Warden Owens stated: "it will all work out."  Shortly thereafter, Warden Owens placed Defendant Nunez—a corrections officer and not a mental health provider—in charge of Mr. Anderson's mental health care, even though trained mental health staff (e.g., Angela Stevens, a CSP mental health supervisor who met with Mr. Anderson in December 2017) was available to manage Mr. Anderson's care.

67.     Nunez told Mr. Anderson that he would help to implement a mental health treatment plan, and, in or about December 2017, one multi-disciplinary meeting was in fact held. That meeting involved Mr. Anderson, Major Nunez, Angela Stevens, Mr. Anderson's case manager, and others.  At the meeting, Major Nunez announced that he was in charge the sessions.  Afterward, Ms. Stevens told Mr. Anderson that she had no control over whether meetings were held or the kind of mental healthcare Mr. Anderson received; Ms. Stevens said that everything had to go through Major Nunez, per Warden Owens's instruction.

68.     No further multi-disciplinary meetings took place.  Mr. Anderson received no collaborative therapy.  In fact, Major Nunez wrote a memo—placed in Mr. Anderson's property on the eve of his abrupt and unexpected transfer to CTCF approximately two months later— stating that each of the items discussed and agreed upon in that December meeting was denied. Warden Owens failed to engage in any follow up or oversight relating to Mr. Anderson's care. Instead, he knowingly and actively acquiesced to Nunez's actions, and did nothing.  As a result, Mr. Anderson did not receive adequate care and his accommodations were not reinstated.

69.     In late October 2018, shortly after Mr. Anderson had been returned to CSP following transfers to and from multiple other CDOC facilities, CDOC's then Chief of Psychiatry informed Mr. Anderson that he had participated in a conference with Warden Owens and others about Mr. Anderson's mental health treatment, and that Warden Owens had agreed to instruct his staff to meet with Mr. Anderson to discuss it.  No such meeting took place.

70.     Similarly, on information and belief, at the time of Mr. Anderson's transfer to LCF in or around June 2018, Warden Falk and Headquarters also conferred about Mr. Anderson and, in particular, Mr. Anderson's mental health treatment.  Both the former CDOC Chief of Psychiatry, Dr. Darren Lish, and the LCF Head of Security, Major Butcher, informed Mr.

Anderson that Warden Falk was responsible for and personally involved in making decisions about Mr. Anderson's mental health care, and that he decided what mental health care Mr. Anderson would receive or not receive at LCF.

71.    Prior to becoming the Warden at LCF, Falk attended a January 20, 2014 meeting at Sterling Correctional Facility to discuss Mr. Anderson's mental health care and treatment needs.  This meeting ultimately led to the Sterling Mental Health Treatment Plan, created by Dr. Willson and described above.

**E. Defendants force fed Mr. Anderson and retaliated against him for requesting mental health care.**

72.    Not long after Defendant Kirk initially revoked Mr. Anderson's care at FCF, on or about July 11, 2017, CDOC transferred Mr. Anderson from FCF to the infirmary at Colorado Territorial Correction Facility ("CTCF") to be treated for severe dehydration and malnutrition stemming from his refusal to eat in protest of Defendants' revocation of the effective mental health treatment he had been receiving at FCF.

73.     Mr. Anderson's treating medical provider at the infirmary was a Physician's Assistant ("P.A.") named Cecilia.  P.A. Cecilia ordered Ensure, a high calorie meal replacement shake, for Mr. Anderson, and Mr. Anderson complied with the order.  He drank Ensure and juice every day for three weeks.

74.    After three weeks, however, P.A. Cecilia told Mr. Anderson that Headquarters (specifically Jill Lampela) had instructed her not to renew her order for Ensure because providing Ensure to a hunger-strike inmate was contrary to CDOC policy.  Apart from P.A. Cecilia, other nursing staff also told Mr. Anderson that this order came directly from Lampela in Headquarters.  Mr. Anderson objected because there was no such policy, and P.A. Cecilia

escalated the issue to the Chief Medical Officer ("CMO") at CTCF.  The CMO agreed with Mr. Anderson that providing Ensure was *not* contrary to policy, and reinstated access to Ensure.

75.     Shortly after the order for Ensure was reinstated, Mr. Anderson was abruptly discharged from the CTCF infirmary, removed from hunger strike status, and transferred to CSP. On information and belief, the decisions to discharge Mr. Anderson from the CTCF infirmary, remove his hunger strike status, and transfer Mr. Anderson to CSP were made at a staffing meeting that occurred on or about August 10, 2017 involving Defendant HQ.  On information and belief, HQ directed Mr. Anderson's transfer to CSP and removal from hunger-strike status in order to break his strike and to punish Mr. Anderson.

76.     Mr. Anderson was transferred to CSP.  Although Mr. Anderson was still on hunger strike when he arrived, CSP medical staff told Mr. Anderson that per instructions from HQ, he was no longer considered to be on hunger strike.  Mr. Anderson's treating physician at CSP, Dr. Hodge, ordered that Anderson be sent back to the CTCF infirmary; that he be allowed to consume Ensure and juice; and that only if he refused should Mr. Anderson be force fed.  So Mr. Anderson was transported *back* to the CTCF infirmary.

77.     As he had before the Ensure was initially withdrawn, Mr. Anderson agreed to drink the supplement.  This time, Mr. Anderson's treating provider at the CTCF infirmary was Defendant P.A. Boyd.  Defendant HQ again instructed that providing Ensure to Mr. Anderson was contrary to policy, and HQ instructed Boyd to force feed Mr. Anderson with the Ensure instead.  Unlike P.A. Cecilia, P.A. Boyd did not question that directive and ignored pleas from Mr. Anderson and comments from nursing staff who both pointed out that allowing Mr. Anderson to drink the Ensure was not contrary to policy.  Instead—contrary the instruction of Dr. Hodge—P.A. Boyd followed HQ's instruction to force feed Mr. Anderson.  In so doing,

Defendant Boyd flatly told Mr. Anderson that she was following instructions from HQ and, in particular, Jill Lampela.  Other nursing staff and Dr. Hodge also later told Mr. Anderson that the order to force feed him came from HQ, and in particular, Lampela.

78.     Lampela was involved in the 2010 action, and both the 2010 action and Mr. Anderson's requests for appropriate mental health care have been inconvenient and time-consuming for HQ.  That Mr. Anderson has engaged in hunger strikes as a means of protesting the absence of adequate mental health has been particularly troubling to Lampela because her role and reputation at CDOC involve ensuring that CDOC inmates receive adequate mental health care.  Mr. Anderson's repeated complaints about the absence of adequate mental health care incentivized Headquarters to suppress Mr. Anderson's protests.

79.     Beginning on or about August 18, 2017 and continuing for four days, Boyd and nursing staff restrained Mr. Anderson and force fed him with Ensure, the very same supplement Mr. Anderson was willing (and requesting) to take orally.  Mr. Anderson was chained to the bed for the entirety of the force feeding.  He was required to urinate and defecate in a bucket. Continuous force-feeding for days on end is contrary to the clinical standard of care and dangerous.

80.     As a result of the force-feeding, Mr. Anderson suffered severe pain, swelling in his eye, extreme anxiety, humiliation, and insomnia.

**F.  CDOC transferred Mr. Anderson to CSP Soft Housing for the first time in August 2017, and failed to provide any meaningful mental health care at CSP.**

81.     On or about August 22, 2017, still on hunger strike after the forced feeding, Mr. Anderson was again transferred back to CSP.

82.     CDOC policy states that prisoners may be placed on Removal from Population ("RFP") status if housing the offender in the general population "would be inconsistent with the safety of the offender, DOC employees," or others.  Offender Classification, CDOC AR 600-01 § IV(O) (Sept. 15, 2019).  RFP housing is solitary housing where inmates are allowed only minimal belongings (linens, toiletries, and legal papers).  Prisoners in RFP housing have no contact with other prisoners.

83.     Mr. Anderson was in a severely weakened state due the hunger strike and forced feeding, and so was defenseless and vulnerable.  He faced a substantial risk of harm if placed in general population.  Instead of placing Mr. Anderson in RFP housing, however, CDOC assigned him—despite his protests and requests for RFP housing—to "Soft Housing" (discussed *infra*). Mr. Anderson remained in Soft Housing for approximately seven months, from August 2017 until his transfer out of CSP in February 2018.

84.     Other than brief, sporadic visits with different mental health providers and his prescription medication, Mr. Anderson received no care for his mental health diagnoses.  He did not receive collaborative therapy as prescribed in the CDOC Treatment Plans.

85.     Although from February 2018 to August 2018, Mr. Anderson was transferred from CSP to and between multiple CDOC facilities, Mr. Anderson was transferred back to CSP in August 2018.  From that time to the present, Mr. Anderson has not received adequate mental health care at CSP.  Mr. Anderson meets with a different therapist once a month or once every two months, for only 15 to 30 minutes at a time.  During these infrequent visits, Mr. Anderson has seen at least four different therapists since being transferred back to CSP in August 2018. The inconsistent providers and the short and sporadic meetings have made it impossible for Mr.

Anderson to establish a relationship with any provider and to receive meaningful mental health treatment consistent with his diagnoses and prescribed treatment.

> **G. Defendants failed to provide mental health care at CTCF and BVCF, and deliberately failed to protect Mr. Anderson from an assault about which Mr. Anderson warned them in a "Letter of Warning."**

86.     After his first stay in CSP Soft Housing, Mr. Anderson was transferred to CTCF in February 2018, and then from CTCF to BVCF in March 2018.  He remained at BVCF for four months, until June 2018.

87.     In March 2018, at CTCF, Mr. Anderson again requested medical escorts and food trays.  Upon his arrival at CTCF, Mr. Anderson met with Major Sandavol, who told Mr. Anderson that she would work with him and help to create a mental health treatment plan.  Mr. Anderson was, at least for a time, allowed to have escorts.  But Darcy Cole, the mental health therapist at CTCF, told Mr. Anderson that she had no knowledge of or involvement in creating or implementing a mental health treatment plan for Mr. Anderson.

88.     Major Sandovol later told Mr. Anderson that, per the instruction of Headquarters, he would not receive food trays.

89.     Sergeant Crane, Mr. Anderson's unit manager, overheard Mr. Anderson venting about these issues to another corrections officer named Officer Wollford.  Ms. Crane had repeatedly heard Mr. Anderson request mental health accommodations and had expressed dissatisfaction with Mr. Anderson's repeated requests for care.  Ms. Crane was particularly irritated about Mr. Anderson's accommodation for escorts, and would harass the approved escorts and, at times, disallow them from entering Mr. Anderson's unit to accompany him.

90.     After the conversation, Unit Manager Crane ordered that Officer Wollford write Mr. Anderson up for threatening him, even though Mr. Anderson had not threatened him.

91.     Officer Wollford later confirmed in a disciplinary hearing that Mr. Anderson did not threaten him.  Nonetheless, the false disciplinary action was used to justify transferring Mr. Anderson from CTCF (Medium Custody) to BVCF (Close Custody).

92.     Upon arrival at BVCF, Mr. Anderson again requested accommodations akin to those he had had at FCF.  He spoke directly to MHS Thomas Fox, who promised to provide food trays and escorts, and stated that he would meet with Mr. Anderson the next week to develop a treatment team.  MHS Fox stated that there had been conferences among BVCF staff about Mr. Anderson's care, and that he would discuss the issue with his boss, HSA Johnson.

93.     But neither Fox, Johnson, nor anyone else at BVCF provided Mr. Anderson with food trays or any other accommodations or care relating to his mental health conditions.

94.     In fact, Mr. Anderson met with a mental health provider only once during his time at BVCF.  And that meeting (with a Ms. Mitcel) occurred only because Mr. Anderson had recently been assaulted, as described below.  Later, during a meeting with other BVCF staff, Defendant HSA Dayna Johnson—Mental Health Supervisor Fox's boss—told Mr. Anderson that his mental health care was not up to her.

95.     Mr. Anderson did not have regular meetings at BVCF with mental health care providers, and he did not receive any mental health care other than his Ritalin prescription.

96.     Shortly after he arrived at BVCF, Mr. Anderson was assigned to a cell with a 211 gang prospect named Michael Greer.  Because Mr. Anderson defected almost 10 years ago from a gang that merged with the 211 gang, any member of the 211 gang is extremely dangerous to Mr. Anderson.  Mr. Anderson was at particularly high risk because he had been transferred to BVCF after having been housed in CSP Soft Housing (discussed *infra*), a widely known fact among inmates.

97.     Mr. Anderson was marked for death.  A high-ranking 211 member ordered Mr. Greer to kill Mr. Anderson because the 211 gang had become aware that Mr. Anderson had been placed in Soft Housing.  The gang members involved believed Mr. Anderson was an informant or was engaged in other activities to undermine the gang because of his time in Soft Housing.

98.     After talking with Mr. Greer, however, Mr. Anderson learned that Mr. Greer did not wish to carry out this order to kill him.  Still, Mr. Anderson knew that either Mr. Greer would have to kill him or Mr. Greer would himself be killed for ignoring a gang directive.

99.     So on May 10, 2018, Mr. Greer and Mr. Anderson jointly wrote a letter entitled "Letter of Warning of Danger" to Defendants Unknown Individuals at BVCF.  On the same day, Mr. Anderson delivered this letter to Officer Howell who came by Mr. Anderson's cell, accompanying a nurse, at approximately 4:30 am.  On information and belief, Officer Howell brought the letter to Captain Shields.  The letter explained to Officer Howell, Captain Shields, and other Unknown Individuals at BVCF the danger Mr. Anderson and Mr. Greer faced, and asked them to intervene to prevent an assault or killing.

100.    Officer Howell, Captain Shields, and other Unknown Individuals at BVCF did nothing in response to the letter.

101.    The very same day—and as Mr. Anderson predicted in his "Letter of Warning"— Mr. Anderson was assaulted by a different 211 gang member on his way to get his medicine.  He suffered severe pain and temporary loss of vision from the attack.

102.    Officer Howell, Captain Shields, and the Unknown Individuals at BVCF did not conduct an investigation following the assault or take any measures to prevent further assaults.

103.    After the assault, Mr. Anderson was sent to RFP housing.  The next month, in June 2018, Mr. Anderson was transferred to SCF, where he remained for only a short time.

**H. Defendants denied Mr. Anderson adequate mental health care at LCF, and assaulted him for asking for it.**

104.     In the same month, June 2018, Mr. Anderson was transferred from SCF to LCF.

105.     On information and belief, at or around the time of Mr. Anderson's arrival at LCF, Defendants James Falk, then warden of LCF, and Headquarters, along with other unknown individuals, met to discuss the provision of mental health care to Mr. Anderson at LCF.

106.     Upon his arrival at LCF, Mr. Anderson met with MHS Reed and asked for mental health care to help him function at LCF.  At first, MHS Reed assured Mr. Anderson that he would help him get the mental health care he needed.

107.     MHS Reed did not follow through on his assurance to provide mental health care, and instead refused Mr. Anderson's requests for food trays, a medical pass, and all other accommodations.  HSA Blatnick also denied each of Mr. Anderson' requests for care.  On information and belief, these actions were ordered or otherwise directed by HSA Blatnick's supervisors, including Defendants Falk and Headquarters.

108.     Mr. Anderson also met with Defendants Hawkins and Corbin to request mental health care.  In his unit office, Hawkins openly laughed at Mr. Anderson's request for help, and bluntly stated that he wouldn't receive any help at LCF.

109.     Mr. Anderson did not receive adequate mental health care at LCF.  His Ritalin prescription was the only substantive care he received, and even that was suddenly withdrawn as described below.

110.     Shortly after his arrival at LCF, on or about June 22, 2018, a corrections officer wrote an incident report incorrectly stating that Mr. Anderson diverted his Ritalin by placing a pill in his pocket.  Mr. Anderson has no history of diverting medication and would never do so because the loss of Ritalin—which Mr. Anderson has previously described to the Court as "life

changing," Case No. 10-cv-01005-RBJ-KMT, Apr. 30, 2013 Anderson Decl. ¶ 16, Dkt. 147-7 ("I

don't wish I was dead or contemplate hanging myself every night…. I feel like I can breathe.")—

would be devastating to his mental health.

111.     Although a later investigation revealed the diversion allegation to be unsupported,

based upon the incorrect report alone, Defendant Dr. Westcott immediately discontinued,

without tapering dosage, Mr. Anderson's Ritalin.  He did so without investigation or even asking

Mr. Anderson about the allegation.  Abrupt discontinuation of high-dose Ritalin—Mr. Anderson

was prescribed 60mg per day—is contrary to clinical standards.  That withdrawal caused Mr.

Anderson increased anxiety, mental suffering, and extreme paranoia, which in turn led to conflict

with prison staff.

112.     Believing the medication that had changed his life and allowed him to think

clearly for the first time—to "feel like I am finally free from this sensation" of being constantly

"poked by needles," *id.* ¶ 17—had been taken away from him, Mr. Anderson became paranoid,

distraught, and deeply agitated.  He acted out; was charged with threatening staff; was placed in

RFP housing for more than a week; and then refused to eat to protest the withdrawal of Ritalin.

He went without Ritalin for approximately three weeks.

113.     On or about the morning of July 24, 2018, Mr. Anderson was called to a

disciplinary hearing relating to his behavior after the Ritalin was abruptly stopped.  Mr.

Anderson was still on hunger strike and refused to go to the hearing.  He was sitting on the floor

going through his legal papers when Defendant Officer Masoncup opened his cell door to move

Mr. Anderson to a different housing unit.

114.     Masoncup was accompanied by Hawkins, Corbin, Miller, and other Defendants

Unknown Individuals at LCF.

115.     Officer Masoncup entered the cell, and with help from the other officers, began beating Mr. Anderson.  They slammed his face on the floor of his concrete cell, tazed him, and continued to hit him.

116.     Officer Masoncup and the others carried Mr. Anderson to a "Unit 3 classroom." There, an unknown Lieutenant began choking Mr. Anderson.  The Lieutenant asked Mr. Anderson "are you done with your shit?"  Mr. Anderson, referring to his requests for mental health care, responded "not until we have a plan."  The unknown Lieutenant, while continuing the beating, answered "this is the only plan you'll get."

117.     Mr. Anderson's reference to "a plan" meant his request for a mental health care plan (e.g., the CDOC Treatment Plans), which he had repeatedly requested.  The LCF officials that assaulted Mr. Anderson were aware of Mr. Anderson's requests for a mental health care plan to treat the conditions CDOC mental health providers have repeatedly diagnosed.  Mr. Anderson had filed multiple grievances about this issue at LCF, including on or about June 21, 2018, July 2, 2018, and August 1, 2018.

118.     Defendants Masoncup, Hawkins, Corbin, Miller, and Unknown Individuals at LCF then restrained Mr. Anderson and dragged him to another cell, A-205 in Unit 3, in only his socks, shirt, and underwear.  They locked Mr. Anderson in that cell with an inmate widely known to be a violent rapist.

119.     The inmates in the cells adjacent to the cell in which Mr. Anderson was locked with the dangerous cellmate passed Mr. Anderson clothes when they saw him undressed, badly beaten, and housed with a notoriously dangerous rapist.  They loudly objected to Mr. Anderson being beaten and placed in the cell.

120.     Shortly after the assault, on or about July 25, 2018, Major Butcher—the LCF head of security—met with Mr. Anderson.  Mr. Anderson asked Major Butcher to investigate his recent assault and asked for help in securing the care he needed.  Major Butcher stated that Mr. Anderson's requests for mental health treatment and accommodations were "above his head," and up to Warden Falk to decide.

121.     After the meeting, Butcher requested that Defendants Kristin Davis, a metal health therapist, and HSA Blatnick meet with Mr. Anderson to discuss his mental health needs and to arrange appropriate accommodations.  Davis met with Mr. Anderson, but told him that she could not authorize any particular treatment and that Mr. Anderson's treatment was up to Defendants Reed and Blatnick.

122.     Blatnick never met with Mr. Anderson.  Mr. Anderson filed requests for care and grievances requesting mental health care and accommodations.  One response from the Accommodations Implementation Coordinator instructed Mr. Anderson to contact clinical services in order to receive accommodations.

123.     Mr. Anderson provided this response to Davis, who in turn sent it to Blatnick, Reed, and Westcott.  But these Defendants did not respond or take any action to provide mental health care or accommodations.  Instead, they did nothing.  Warden Falk also took no action to supervise these Defendants or to follow-up on Mr. Anderson's repeated requests for care.  As a result, Mr. Anderson did not receive adequate mental health care at LCF.

   **I.   CDOC has narrowly defined "major mental illness" and applied that definition in a manner that inappropriately excludes—as a matter of policy—Mr. Anderson (and other inmates) from certain programs, treatment, and benefits.**

124.     Between 2010 and late 2012, CDOC had a program at Centennial and CSP called Offenders with Mental Illness ("OMI") that specialized in providing intensive mental health care

to mentally ill inmates.  The OMI program involved therapy, substance abuse counseling, and teaching inmates to communicate and socially interact with each other.  A key component of the OMI program was its use of multi-disciplinary treatment teams, which included mental health clinicians, case managers, the pod lieutenant, the housing captains, and correctional officers.

125.    Mr. Anderson was placed in the OMI program in June 2011.  According to his then-treating psychiatrist, Dr. Vicky Tuakoi, he was removed from the program in October 2011 because of behavior that was "a manifestation or . . . indicative of a mental illness that Mr. Anderson [was] diagnosed with."

126.    During the bench trial in the 2010 Action, on May 2, 2012, the Court asked Dr. Jill Lampela—then CDOC Health Services Administrator—about the prospects of Mr. Anderson's re-entering the OMI program.  Dr. Lampela responded "Oh, absolutely," and explained that "treatment is not always successful the first time around"; that Mr. Anderson was "working hard to get back into the OMI program"; and that Mr. Anderson was continuing with the same therapist to help him re-enter the OMI program because continuity of care was critical given that Mr. Anderson "really struggles with building rapport and trust issues."

127.    In or before March 2013, CDOC eliminated the OMI program, and replaced it with something called the Residential Treatment Program ("RTP").  Functionally, RTP is a continuation of the OMI program.  As a November 1, 2013 CDOC Performance Plan for the years 2014–2015 explained, "The offenders with mental illness (OMI) program has been relocated to Centennial Correctional Facility (CCF) and renamed RTP."

128.    On February 15, 2013, Sterling mental health staff referred Mr. Anderson for a transfer to the RTP program.  In the referral paperwork, Michelle Russum, Mr. Anderson's assigned therapist at SCF, wrote: "client needs assistance with coping skills, ego capacity and

33

stabilization of [symptoms], he would greatly benefit from continuing the RTP program to help him with social skills, frustration tolerance, and stabilization of his mental health [symptoms]." On March 20, 2013, Dr. Jill Lampela testified that the RTP has services that would be helpful in treating Mr. Anderson's mental illness.

129.    Despite all this, Defendants deem Mr. Anderson to be ineligible for the RTP, along with a range of other benefits, treatment, and accommodations available to other similarly situated inmates.  That is because, as of March 2013, CDOC created a new definition of "major mental illness"; defined Mr. Anderson's diagnoses to be outside of that definition; and made meeting that definition a requirement for being admitted to the RTP and receiving a range of other benefits.

130.    Each inmate is assigned a psychological needs score, commonly called the "P code," which may be modified by certain "qualifiers" and subsequently revised.  In March 2013—the month after CDOC referred Mr. Anderson for a transfer to the RTP and the very same month in which Dr. Jill Lampela testified that the RTP could help treat Mr. Anderson's mental illness—CDOC created a new "qualifier," the "M" qualifier, with the stated purpose of differentiating offenders with a "major mental illness" from those with "serious mental health treatment needs" that stem from something other than a major mental illness.

131.    CDOC's mental health policy defines "Serious Mental Illness" to mean "current diagnosis of any of the [listed] DSM diagnoses accompanied by the P-code qualifier of M, denoting the presence of a major mental disorder."  CDOC AR 700-03, § III.D (July 1, 2013).[3]

---

[3]    DSM diagnoses refer to classifications found in the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association.

132.     Only offenders with an M qualifier (i.e., those with a diagnosis of "major mental illness") are eligible for the RTP.  So on March 20, 2013, contrary to her 2012 testimony that Mr. Anderson would "absolutely" be eligible to rejoin the RTP's legacy program (the OMI Program), Dr. Jill Lampela testified that Mr. Anderson was ineligible for the RTP because he lacked an M qualifier.

133.     The absence of a "major mental illness" diagnosis (or M qualifier) also affects Mr. Anderson's treatment with respect to housing and discipline.  Per CDOC policy, for example, when transferring an offender to restrictive housing in certain circumstances, CDOC mental health staff are only required to consider whether an offender's actions are related to their mental illness if the offender has certain qualifiers, including an M qualifier.

134.     CDOC policy also expressly provides for a range of services for offenders with "serious mental illness" that include group and individual treatment, collaboration with correctional DOC employees and contract workers regarding special needs, specialized programs to promote self-management, specialized housing and management, and special assistance with transition to the community.  Notwithstanding the CDOC Diagnoses and CDOC Treatment Plans, because Defendants have classified Mr. Anderson's mental illness as falling outside the scope of "serious mental illness," he is ineligible for these programs and benefits.

J.   **CSP officials erroneously classified Mr. Anderson as a gang member and housed him in a dangerous housing unit.**

135.     In August 2018, Mr. Anderson was transferred from LCF back to CSP.

136.     According to CDOC policy, an Internal Classification Committee ("ICC"), a multidisciplinary committee within each facility chaired by the Administrative Head of the facility, is responsible for all facility internal classifications and housing/cell assignments, among other responsibilities.  Offender Classification, CDOC AR 600-01 (July 15, 2019).  Per CDOC

policy, the ICC would have been well aware of Mr. Anderson's lack of gang affiliations, mental health diagnoses, and the security level of his custody at previous facilities.  And the ICC was, in fact, aware of these facts in or around August 2018.

137.    The CSP ICC—with the knowledge, participation, and oversight of Defendant Owens, then the CSP Warden—classified Mr. Anderson as a gang member, despite the fact that Mr. Anderson had defected from his former gang almost 10 years before and had no gang affiliations since that time.  On information and belief and pursuant to CDOC policy, the Central Classification Committee in the Office of Offender Services, described below, approved Mr. Anderson's classification as a gang member.

138.    Because Mr. Anderson was classified as a gang member, Warden Owens and Lieutenants Johnson and Hagans were able to assign Mr. Anderson to a high-risk Management Control Unit ("MCU"), along with inmates who were dangerous to Mr. Anderson.  The MCU to which Mr. Anderson was transferred housed inmates affiliated with the gang that was responsible for his assault during his incarceration at BVCF.  Defendants Owens, Johnson, and Hagans knew about the BVCF assault and about Mr. Anderson's lack of gang affiliation.

139.    The MCU also included 211 gang members who were likely to target Mr. Anderson for murder or assault because he had defected from the gang years before, because he had since spoken out against gang activities, and because he had previously been housed in CSP Soft Housing.

140.    As noted above, Mr. Anderson's prior stint in Soft Housing gave rise to the BVCF assault, and Mr. Anderson had expressly warned Defendants about the risk of assault before the assault occurred.  Defendants Owens, Johnson, and Hagans knew that assigning Mr. Anderson to the MCU at CSP would create a substantial risk that he would be harmed by other inmates.

141.     Mr. Anderson's assignment to the high-risk MCU was even more notable given his physical state.  As described above, when originally transferred to CSP in August 2017, Mr. Anderson was placed in "Soft Housing" because he was physically debilitated by a lengthy hunger-strike.  But this time, one year later, Mr. Anderson was even more physically weak and vulnerable than he was in August 2017.  En route to CSP, Mr. Anderson lost consciousness in the transportation van, and at the time of his transfer, Mr. Anderson could not stand up or walk unassisted.

142.     Nonetheless, Defendants assigned Mr. Anderson to the high-risk MCU with violent offenders.  He remained there for approximately four months, until approximately December 11, 2018.  Throughout that period, Mr. Anderson engaged in a "self-lockdown," i.e., refused to leave his cell, in order to avoid assault at the hands of another gang-affiliated inmate.

### K. Defendants used excessive force to transfer Mr. Anderson out of state, a transfer that served no purpose other than retaliation.

143.     On or about December 11, 2018, CDOC transferred Mr. Anderson to Montana State Prison ("MSP")—only to return him to Colorado two weeks later.

144.     Defendants Unknown Individuals who Effectuated Transfer entered Mr. Anderson's cell at approximately 2:20 am.  Severely weakened from a hunger strike, Mr. Anderson was unable to stand up or to walk.

145.     The officers strip-searched Mr. Anderson in his cell.  They did so roughly and aggressively, and dislocated Mr. Anderson's shoulder in the process.

146.     The officers did not provide a wheelchair for Mr. Anderson, who could not walk. Instead, the officers dragged Mr. Anderson to the transportation van.  After the officers loaded Mr. Anderson into the van, he was forced to pop his own shoulder back into place to minimize the pain.  Mr. Anderson lay down on the floor of the van during the entire trip to Gillette,

Wyoming (approximately a seven-hour drive).  He had no seat or seatbelt or other safety restraint.

147.    An officer from MSP met the unknown CDOC officers in Gillette, WY, and they transferred Mr. Anderson to a different van for the remainder of the drive to MSP. Approximately two weeks later, on or about December 27, 2018, Mr. Anderson was transferred back to CSP, where he remains to this day.

148.    On information and belief, Mr. Anderson's prison records did not accompany him to Montana, and the Montana Department of Corrections was unaware of Mr. Anderson's mental or physical health status, including that he was on hunger strike at the time of his transfer.

149.    On or about January 6, 2019, Defendants Owens, Headquarters, and others participated in a medical staffing meeting to discuss Mr. Anderson's care.  On information and belief, Defendants decided at that meeting to remove Mr. Anderson from hunger strike status.

150.    No legitimate penological purpose was served by roughly transferring Mr. Anderson—in the middle of the night and after dislocating his shoulder—to Montana, only to return him to Colorado two weeks later.

> **L.  Defendants knowingly fail to protect a Class of CSP prisoners from assault stemming from dangerous housing designations.**

151.    CSP's policy and practice of using the informal housing classification known as "Soft Housing" affects current and future CSP inmates who are placed in these "soft" units or "pods."  As a general matter, CDOC places inmates in Soft Housing because they need protection from the general population, primarily because the inmates are debilitated, vulnerable, or at risk of being assaulted or killed by other inmates.  The Class consists of all current and future CSP inmates who are, or may in the future be, placed in Soft Housing.

152.     Soft Housing is the nickname used by inmates for what prison administrators refer to as "specialized," "specific," or "security" housing.  Soft Housing exists only at CSP, and is not a formal housing designation recognized in CDOC's policies.

153.     In practice, Soft Housing is treated as an alternative to (or overflow for) "Protective Custody."  Protective Custody or "P.C." is a formal housing designation governed by CDOC policy.  Protective Custody, CDOC AR 650-02 (Oct. 1, 2019) ("It is the policy of [CDOC] to provide adequate alternate housing placement for offenders who are at substantial risk of serious harm if placed in a general population setting.  Protective Custody is not a punitive measure.").  On information and belief, P.C. facilities are not available at CSP, but are available at BVCF and Arkansas Valley Correctional Facility in Ordway, Colorado.  Inmates seeking to be placed in P.C. must complete paperwork to formally request it.

154.     After an inmate requests placement in Protective Custody, the prison staff investigates the inmate's stated reasons for needing to be housed in P.C.  After the investigation, a hearing is held to decide whether Protective Custody is warranted.  CDOC documents its decisions with respect to granting or denying requests for Protective Custody.

155.     Inmates who are placed in Protective Custody are removed from the prison population and do not have contact with inmates other than those who are also in Protective Custody.  Inmates may be removed from Protective Custody if they exhibit violent behavior.

156.     The need to securely house at-risk prisoners at CSP (and other facilities) is far greater than the number of beds available in formal Protective Custody.  CSP administrators created Soft Housing to fill the gap.

157.     Defendants' use of Soft Housing is not governed by the formal measures and procedures associated with Protective Custody.  Its use does not create the paper trail that the

request, hearing, and decisional processes of Protective Custody create.  Placement in Soft Housing is not subject to formal investigation, hearing, or any other equivalent process.  Inmates may not request or apply to be placed in Soft Housing—nor would they.

158.    Nor do inmates placed in Soft Housing receive the same protections that they would in Protective Custody.  Inmates are afforded no guarantee that they will remain in Soft Housing for any particular length of time.  Instead, inmates in Soft Housing can be—and routinely are—removed from Soft Housing at any time.  Other CDOC facilities do not have Soft Housing:  inmates transferred out of CSP Soft Housing are typically transferred to the general populations of CSP or other prison facilities.

159.    Soft Housing also does not afford inmates the anonymity of Protective Custody. The Soft Housing pods at CSP are interspersed with general-population pods.  As a result, other CSP inmates are aware of which prisoners are in Soft Housing.  This information carries between facilities.

160.    CSP inmates and inmates at other CDOC facilities generally believe that inmates in Soft Housing are informants, are weak, or are easy targets for assault or exploitation.  Upon their release into CSP general population or transfer to another facility, inmates who were located in CSP Soft Housing are routinely targeted by other inmates and face a high risk of assault.

161.    Prisoners with mental illness or a former gang affiliation (like Mr. Anderson) are routinely targeted by other inmates within the CDOC system.  Association with CSP Soft Housing significantly increases the chance that such inmates will be the target of inmate-on-inmate violence.

162.    Some members of the Class are former gang members who are being targeted because of their previous gang affiliations and their choice to leave the gang.  Still other members of the Class are in danger for other reasons, like their sexual orientation or type of offense.  Some have already been assaulted while awaiting a decision on their requests for Protective Custody.  Others have been assaulted after their requests for P.C. have been denied.

163.    These substantial risks of serious harm make the prospect of being placed in Soft Housing terrifying for many inmates.  For example, some inmates would like to disaffiliate from prison gangs.  But many are too frightened to leave their gangs because the risk is too great that they would later be denied P.C. and placed in Soft Housing—i.e., not removed from population but rather placed on display to their former gangs as informants or weak and therefore marked for near-certain assault or worse upon their transfer out of Soft Housing.

164.    Pursuant to CDOC policy, separate from the facility-specific ICC(s) described above, a Central Classification  Committee, housed within the Office of Offender Services, determines to which CDOC facility inmates will be assigned; reviews and verifies any existing custody issues and risks before inmates are transferred between facilities; and plays a key role in determining offenders' custody classification.

165.    The Office of Offender Services is housed within CDOC's Department of Prisons. Two Deputy Directors oversee the Department of Prisons.  The Deputy Director charged with oversight of both the Office of Offender Services and CSP is Defendant Steve Owens.

166.    The prison staff, officers, and leadership at CSP and in the Department of Prisons—including, in particular, Defendant Owens, the former warden of CSP—are well aware of the risk inmates face upon being released from Soft Housing.  Mr. Anderson and other inmates have repeatedly warned Defendants that they are in danger of being assaulted or killed

by other inmates after leaving Soft Housing.  In addition, CSP inmates, including Mr. Anderson, routinely file grievances about these risks.  Mr. Anderson has filed multiple grievances about this issue, including on or about October 28, 2019 and March 7, 2020.  Other members of the putative class have also notified prison staff about this danger and filed grievances about it, including as early as April 14, 2016.

167.    As described above, Mr. Anderson was placed in CSP Soft Housing (for the first time) in August 2017 after he was transferred to CSP in a weakened state due to a hunger strike. Because of the danger he knew he would face upon release from Soft Housing, Mr. Anderson filed paperwork requesting to be moved to RFP Housing instead.  Mr. Anderson told the CSP officials who placed him in Soft Housing that he was terrified of being placed there.  Defendants nonetheless refused Mr. Anderson's request to be transferred, and he remained in Soft Housing until he was transferred from CSP to CTCF in February 2018.  Approximately one month later, in March 2018, he was transferred to BVCF.

168.    When Mr. Anderson arrived at BVCF, the inmates there knew Mr. Anderson had been housed in CSP Soft Housing.  Mr. Anderson tried to convince the other inmates that he was forced into Soft Housing as a result of his hunger strike—he even showed them his paperwork requesting to be moved out of Soft Housing.  But Mr. Anderson was assaulted anyway on or about May 10, 2018 because the gang members that assaulted him believed he was an informant or cooperating with authorities against his former fellow gang members because he had been in Soft Housing.

169.    Shortly after the assault, during Mr. Anderson's transfer to LCF in June 2018, two high-ranking 211 gang members threatened Mr. Anderson with future assault or worse if he were to go back into Soft Housing.  Specifically, on a bus ride to LCF, a General in the 211 gang (the

highest rank in the gang), told Mr. Anderson that if he ever went back to Soft Housing he would be assaulted or killed.

170.    Defendants have failed to investigate inmate complaints or to take any action to protect at-risk inmates when they are transferred out of Soft Housing.  Instead, despite repeated instances of violence and warnings from inmates about the dangers associated with Defendants' policy or practice of using Soft Housing in the manner described above, Defendants continue consciously to ignore these risks.

171.    As a result of these practices, multiple members of the Class, including Mr. Anderson, have been assaulted in the past and remain at risk of being assaulted or killed in the future when they are transferred out of Soft Housing.

### COUNT I – DELIBERATE INDIFFERENCE TO MEDICAL AND MENTAL HEALTH NEEDS
### (Eighth Amendment Claim for Damages and Prospective Relief under 42 U.S.C. § 1983)

172.    Mr. Anderson adopts by reference all the preceding paragraphs.

173.    Mr. Anderson has been diagnosed by multiple mental health care professionals appointed by CDOC, including a psychiatrist and a psychologist, as having a serious mental illness that requires psychological and psychiatric care.

### HQ, Owens, Dauffenbach, and Falk (the "Supervisory Defendants")

174.    At all times relevant to this action, the Supervisory Defendants had knowledge of Mr. Anderson's CDOC Diagnoses, the 2010 Action, the CSP Mental Health Treatment Plan and the Sterling Mental Health Treatment Plan, and Mr. Anderson's serious mental health care needs. In his prior role as Warden of Sterling Correctional Facility, Warden Falk was also privy to settlement discussions relating to the 2010 Action.

175.    As current and former directors and supervisors of CDOC facilities and mental health programs, the Office of Offender Services, and the Department of Prisons, the Supervisory Defendants are responsible for ensuring that CDOC prisons afford appropriate care to CDOC inmates.

176.    Mr. Anderson repeatedly notified the Supervisory Defendants about the deprivations in his care and about the resulting adverse consequences to his mental health and ability to function.

177.    Defendants took no action to abate these conditions or to supply Mr. Anderson with health care consistent with his diagnoses.  Instead, the Supervisory Defendants implemented, continued, and were responsible for a policy or practice of placing non-mental health care providers in charge of Mr. Anderson's mental health care.  The Supervisory Defendants then failed to supervise the provision of care to Mr. Anderson and actively acquiesced in their subordinates' failures to provide Mr. Anderson adequate care.

178.    As a result, Mr. Anderson was shuffled from facility to facility with woefully inadequate care—care that has not included, for example, the treatment prescribed in the CDOC Treatment Plans described herein.

179.    Defendant HQ also instructed a Physician's Assistant to deviate from the advice of Mr. Anderson's treating medical provider to force feed Mr. Anderson in a manner contrary to clinical standards and dangerous to Mr. Anderson's health.

**MHS Fox and HSA Johnson (BVCF)**

180.    At all times relevant to this action, Defendants Fox and Johnson knew about Mr. Anderson's CDOC Diagnoses and accompanying serious medical needs

181.   Mr. Anderson repeatedly notified Fox and Johnson about the deprivations in his care and about the resulting adverse consequences to his mental health and ability to function. Fox and Johnson were also aware of the grievances Mr. Anderson had filed requesting adequate mental health care.

182.   Defendants Fox and Johnson took no action to abate these conditions and to supply Mr. Anderson with health care consistent with his diagnoses. Instead, Fox and Johnson denied Mr. Anderson's requests for care, and intentionally disregarded the known risks this posed to Mr. Anderson's mental health.

183.   As a result, aside from his Ritalin prescription, Mr. Anderson did not receive any meaningful mental health care during his time at BVCF.

**Major Nunez (CSP)**

184.   At all times relevant to this action, Defendant Nunez knew about Mr. Anderson's CDOC Diagnoses and accompanying serious medical needs.

185.   Mr. Anderson repeatedly notified Defendant Nunez about the deprivations in his care and about the resulting adverse consequences to his mental health and ability to function. Nunez was also aware of the grievances Mr. Anderson had filed requesting adequate mental health care.

186.   Nunez took no action to abate these conditions or to ensure that Mr. Anderson received health care consistent with his diagnoses. Instead, Nunez denied Mr. Anderson's requests for care, and intentionally disregarded the known risks this posed to Mr. Anderson's mental health.

187.   As a result, Mr. Anderson did not and has not received adequate mental health care at CSP.

**Kathleen Boyd (CSP)**

188.     Deviating from clinical standards to force feed a prisoner for days on end poses an objectively serious risk of substantial harm to the inmate.

189.     Defendant Boyd was aware that force feeding Mr. Anderson under these circumstances posed a serious risk of harm to Mr. Anderson's health or safety.

190.     At the instruction of Defendant HQ, Defendant Boyd consciously disregarded these known risks and proceeded to force feed Mr. Anderson.

191.     Mr. Anderson suffered harm as a result.

**Captain Kirk (FCF)**

192.     At all times relevant to this action, as a member of Mr. Anderson's mental health treatment team at FCF, Captain Kirk knew of Mr. Anderson's CDOC Diagnoses, the CSP Mental Health Treatment Plan, the Sterling Mental Health Treatment Plan, and of Mr. Anderson's serious mental illnesses.  Defendant Kirk knew about the deprivations in Mr. Anderson's care and about the resulting adverse consequences to Mr. Anderson's mental health and ability to function.  Kirk was also aware of the grievances Mr. Anderson had filed requesting adequate mental health care.

193.     Kirk took no action to abate these conditions or to ensure that Mr. Anderson received mental health care consistent with his diagnoses.  Instead, Kirk inappropriately altered Mr. Anderson's treatment plan and accommodations, denied Mr. Anderson's requests for care, and intentionally disregarded the known risks this posed to Mr. Anderson's mental health.

194.     As a result, Mr. Anderson did not receive adequate mental health care at FCF.

**Dr. Westcott, MHS Reed, MHT Davis, and HSA Blatnick (LCF)**

195.     At all times relevant to this action, Dr. Westcott, MHS Reed, MHT Davis, and HSA Blatnick knew of Mr. Anderson's CDOC Diagnoses and his accompanying serious medical needs.

196.     Mr. Anderson repeatedly notified Defendants about the deprivations in his care and about the resulting adverse consequences to his mental health and ability to function. Defendants were also aware of the grievances Mr. Anderson had filed requesting adequate mental health care.

197.     Reed, Davis, and Blatnick took no action to abate these conditions or to ensure that Mr. Anderson received health care consistent with his diagnoses.  Instead, they denied Mr. Anderson's requests for care, and intentionally disregarded the known risks this posed to Mr. Anderson's mental health.

198.     Upon an incorrect report of medication diversion, Dr. Westcott summarily discontinued—without investigation, consulting Mr. Anderson, or tapering dosage—Mr. Anderson's Ritalin.  In so doing, Dr Westcott consciously disregarded a substantial risk of harm to Mr. Anderson's mental health.

199.     As a result, Mr. Anderson did not receive adequate mental health care at LCF.

**COUNT II – EXCESSIVE FORCE**
**(Eighth Amendment Claim for Damages and Prospective Relief under 42 U.S.C. § 1983)**

200.     Mr. Anderson adopts by reference all the preceding paragraphs.

**Defendants Officer Masoncup, Captain Hawkins, Lieutenant Corbin, Sergeant Kyle Miller, and Unknown Individuals at LCF**

201.    Defendants' actions on July 24, 2018, as described above, constituted unreasonable and excessive force, without legal cause, in violation of Mr. Anderson's Eighth Amendment rights.

202.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook it intentionally, with malice and knowing disregard for Mr. Anderson's clearly established constitutional rights, and not for any legitimate penological purpose.

203.    This conduct was the direct and proximate cause of the violations of Mr. Anderson's constitutional rights and of the damages he suffered, including bodily injury, pain, suffering, emotional distress, and humiliation.

**Unknown Officers who Effectuated Transfer**

204.    Defendants actions on or about December 11, 2018, as described above, constituted unreasonable and excessive force, without legal cause, in violation of Mr. Anderson's Eighth Amendment rights.

205.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook it intentionally, with malice and knowing disregard for Mr. Anderson's clearly established constitutional rights, and not for any legitimate penological purpose.

206.    This conduct was the direct and proximate cause of the violations of Mr. Anderson's constitutional rights and of the damages he suffered, including bodily injury, pain, suffering, emotional distress, and humiliation.

**COUNT III – FAILURE TO PROTECT**
**(Eighth Amendment Claim for Damages and Prospective Relief under 42 U.S.C. § 1983)**

207.    Mr. Anderson adopts by reference all the preceding paragraphs.

**Officer Everington Howell, Captain Shields, and Unknown Individuals at BVCF**

208.    Mr. Anderson faced a substantial risk of serious harm at BVCF when he was placed in a cell with a 211 gang member who had been ordered by the 211 gang to kill him because Mr. Anderson was known to have spent time in CSP Soft Housing.

209.    Defendants were aware of that substantial risk of serious harm through Mr. Anderson and Mr. Greer's "Letter of Warning," but they consciously chose to disregard it and to ignore the letter. They took no action to abate the risk Mr. Anderson warned them about.

210.    Mr. Anderson was assaulted and suffered physical injury as a result.  Mr. Anderson would have suffered less harm if Defendants had not been deliberately indifferent.

**Warden Owens, Lieutenant Johnson, and Lieutenant Hagans**

211.    Mr. Anderson faced a substantial risk of serious harm at CSP when Defendants placed him in a housing unit with gang members who were dangerous to Mr. Anderson.

212.    Defendants were deliberately indifferent to that risk by consciously disregarding that Mr. Anderson was not a gang member or otherwise involved in gang activity; that Mr. Anderson was at even greater risk of assault because he had previously been placed in "Soft Housing"; and that other inmates in the particular housing unit in which Defendants placed him were affiliated with the same gang that had recently assaulted Mr. Anderson at BVCF, all facts of which Defendants were aware.

**Officer Masoncup, Captain Hawkins, Lieutenant Corbin, Sgt. Miller, and Unknown Individuals at LCF**

213.    Mr. Anderson faced a substantial risk of serious harm at LCF when Defendants, after using excessive force against Mr. Anderson, dragged him in his socks and underwear into a cell with another inmate who was well-known to be a violent rapist.

214.    Defendants were deliberately indifferent to that risk when they knowingly placed Mr. Anderson, in a defenseless and weakened state after the beating, into the cell with the violent inmate and left him there.

## COUNT IV – ADA
**(Discrimination on the basis of disability in violation of 42 U.S.C. § 12101, *et. seq.* against CDOC)**

215.    Mr. Anderson adopts by reference all the preceding paragraphs.

216.    Mr. Anderson has been diagnosed with various mental disabilities, within the meaning of § 12102, including Attention Deficit Hyperactivity Disorder ("ADHD"), aggressive type Generalized Anxiety Disorder ("GAD"), Intermittent Explosive Disorder ("IED"), Depression, Borderline Personality Disorder ("BPD"), and Antisocial Personality Disorder ("ASPD").  His serious mental illnesses substantially limit his major life activities including learning, thinking clearly, interacting with others, and controlling his moods.

217.    CDOC is a public entity that receives federal funding.

218.    As a CDOC inmate, Mr. Anderson is qualified for the programs, services, aids, activities, and benefits that CDOC and the individual facilities within CDOC offer.

219.    Mr. Anderson, with or without reasonable modifications to rules, policies or practices, met and continues to meet the essential eligibility requirements for the receipt of services or the participation in programs or activities that Defendants provide.  Mr. Anderson is a "qualified individual with disabilities" within the meaning of the ADA, 42 U.S.C. § 12131(2).

220.    CDOC has discriminated against Mr. Anderson in violation of 42 U.S.C. § 12132 and its implementing regulations, as more fully described above, by not providing him reasonable accommodations—or reasonable modifications to policies, practices, and procedures—meant to prepare him to reintegrate back into the general prison population.

221.    As described above, on or about April 21, 2017, and in response to Mr. Anderson's March 2017 Request for Accommodations under the ADA, CDOC approved certain ADA accommodations for Mr. Anderson, including the provision of food trays and a medical pass, and other measures to re-socialize him with certain approved inmates.

222.    Defendants then withdrew these accommodations, and have refused to reinstate them.  Once these ADA accommodations were withdrawn, Mr. Anderson ceased to function healthily and his mental health sharply declined.  As a result, Mr. Anderson has not been able effectively to reintegrate into the prison population and has been dogged by a range of disciplinary infractions that are related to his mental illnesses and Defendants' failures reasonably to accommodate them.  Mr. Anderson has been denied reasonable accommodations and excluded from qualified programs at each CDOC facility referenced herein, except for FCF.

223.    As a consequence of not being given reasonable accommodations, Mr. Anderson has been excluded from participating in services, activities, and programs, including recreation time, receiving visitors, and maintaining a work position.  For example, because CDOC facilities refused to give Mr. Anderson food trays (a common accommodation within CDOC) when he was unable to go to meals with other inmates, Mr. Anderson was unable to access food for long periods of time.

224.    Defendants' discrimination is intentional and/or represents deliberate indifference to the strong likelihood that pursuit of the actions and policies at issue in this Second Amended Complaint would likely result in a violation of federally protected rights.

225.    Mr. Anderson has been injured and aggrieved by and will continue to be injured and aggrieved by Defendants' discrimination.

## COUNT V – REHABILITATION ACT
### (Discrimination on the basis of disability in violation of 29 U.S.C. § 701, *et. seq.* against CDOC)

226.    Mr. Anderson adopts by reference all the preceding paragraphs.

227.    "No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.

228.    Defendants receive and benefit from federal financial assistance as that term is used in 29 U.S.C. § 794 through the Prison Rape Elimination Act and other sources.

229.    Mr. Anderson is an individual with a mental impairment, a record of such an impairment, and is regarded as having such impairment within the meaning of 42 U.S.C. § 12102, as incorporated into 29 U.S.C. § 705(b)(9)(B), which impairments limit his major life activities, as described above.

230.    As an inmate in the custody of CDOC, Mr. Anderson is qualified for the programs, activities, aids, benefits, and services offered by CDOC.

231.    Mr. Anderson, with or without reasonable modifications to rules, policies or practices, met and continues to meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants.  Mr. Anderson is a "qualified handicapped person" within the meaning of the Rehabilitation Act.

232.    Defendants have discriminated against Mr. Anderson on the basis of his disability.  Mr. Anderson has been excluded from services and programs accorded to prisoners on the basis of his disability, including recreation, employment, regular meal time, and educational opportunities.

233.     Defendants have also failed to make reasonable accommodations and modifications to policies, practices, or procedures for Mr. Anderson so that he can take part in the services, activities, and program that CDOC offers.

234.     Defendants' discrimination is intentional and/or represents deliberate indifference to the strong likelihood that pursuit of the actions and policies at issue in this Amended Complaint would likely result in a violation of federally protected rights.

### COUNT VI – RETALIATION
### (First Amendment Claim for Damages and Prospective Relief under 42 U.S.C. § 1983)

235.     Mr. Anderson adopts by reference all the preceding paragraphs.

236.     Mr. Anderson engaged in conduct protected by the First Amendment when he filed and litigated the 2010 Action, requested adequate mental health care, went on hunger strikes, filed grievances with the various correctional facilities in which he was an inmate, and initiated this lawsuit.

### Headquarters (Jill Lampela)

237.     HQ directed Defendant Boyd to force-feed Mr. Anderson during his August 2017 hunger strike rather than allowing him to drink Ensure—even though Mr. Anderson requested to drink Ensure and that request had been approved by his treating physician.

238.     HQ also directed that Mr. Anderson be transferred, in the middle of the night, to Montana, where he remained for mere weeks before being transferred back to Colorado.  No legitimate penological purpose supports Mr. Anderson's short-lived transfer to Montana, including but not limited to the excessive force used to effect that transfer.

239.     Four days of painful force-feeding and a rough, senseless transfer out of state followed by an equally abrupt return to Colorado, would deter a person of ordinary firmness

from continuing to engage in a hunger strike and from continuing to request mental health care and accommodations.

**Sergeant Crane**

240.    After overhearing a non-threatening conversation between Mr. Anderson and another corrections officer in or about March 2018, Crane ordered that Mr. Anderson be disciplined for threatening the other officer.  The false disciplinary report was used to authorize Mr. Anderson's transfer to BVCF, where Mr. Anderson was placed in the most restrictive custody level available at CDOC.

241.    Crane's false report was retaliation for Mr. Anderson's frequent requests for help and complaints about his treatment.

242.    This false disciplinary report and the resulting consequences would deter a person of ordinary firmness from continuing to pursue requests for mental health accommodations.

**Captain Kirk**

243.    A member of Mr. Anderson's mental health team at FCF, Captain Kirk intimated to Mr. Anderson that he believed Mr. Anderson was getting special treatment at FCF, and that he did not agree that Mr. Anderson should receive the accommodations he was then receiving for his mental illness.

244.    Once Warden Archuleta retired, Captain Kirk revoked (without authority) Mr. Anderson's privilege to retrieve his medical prescriptions at a different time than the other inmates.  Although Mr. Anderson requested that this privilege be reinstated and even after another FCF employee attempted to reinstate the medical pass, Captain Kirk still refused to provide this accommodation.

245.     Having to retrieve his medications alongside all the other inmates provoked severe (and unnecessary) anxiety for Mr. Anderson, who was attempting to reintegrate into regular prison life after spending more than a decade in solitary confinement.

246.     The emotional distress caused by the arbitrary revocation of a mental health accommodation would deter a person of ordinary firmness from continuing to file grievances or to seek out proper care.  These actions would also cause a person of ordinary firmness to believe that continuing such protected behavior would result in further detriments to care or accommodations.

**Officer Masoncup, Captain Hawkins, Lieutenant Corbin, and Unknown Individuals at LCF**

247.     Officer Masoncup, Captain Hawkins, Lieutenant Corbin, and other Unknown Individuals at LCF brutally assaulted Mr. Anderson on July 24, 2018.

248.     During that beating, an Unknown Lieutenant asked Anderson "you done with your shit?"  Mr. Anderson responded "not until we have a plan," referring to the mental health treatment plan he had been seeking by filing grievances.  The Unknown Lieutenant responded, "this is the only plan you'll get" before he restrained Anderson and dragged him, with the help of the other Defendants, into a cell with a dangerous inmate.

249.     That Lieutenant and the other officers effectuating the beating were well aware of Mr. Anderson's frequent requests for mental healthcare and grievances relating to the same.

250.     The violent beating and placement in a cell with a dangerous inmate would deter a person of ordinary firmness from continuing to request effective treatment.

<u>**COUNT VII – FAILURE TO PROTECT (CLASS)**</u>
**(Eighth Amendment Claim for Damages and Prospective Relief under 42 U.S.C. § 1983 Relating to Defendants' Policies and Practices Regarding Soft Housing)**

251.     Mr. Anderson adopts by reference all the preceding paragraphs.

**Dean Williams, William Little, Steve Owens, Scott Dauffenbach, and Headquarters**

252.    Mr. Anderson, on his own behalf and on behalf of current and future inmates of CSP who are, or may in the future be, placed in Soft Housing (the "Class") adopt by reference all preceding paragraphs.

253.    CSP's use of "Soft Housing" puts inmates at serious risk assault at the hands of other inmates, particularly gang members, if and when they are transferred out of Soft Housing.

254.    These dangers are widely known among Defendants, including in particular within the Central Classification Unit of the Office of Offender Services, the Internal Classification Committee at CSP, and the Department of Prisons of which Defendant Owens— the former CSP Warden—is Deputy Director.

255.    Defendants promulgated, created, implemented, or possess responsibility for the continued operation of the policy or practice of employing Soft Housing in the manner described herein.

256.    Defendants are deliberately indifferent to the risks created by this policy or practice, and have failed to take any action—e.g., to investigate threats or to heed inmate warnings—to abate them.

257.    As a result, as described herein, current and future denizens of Soft Housing, including Mr. Anderson, have been assaulted after being transferred to another housing unit within the CDOC system, and remain at substantial risk of serious harm if they are transferred out of Soft Housing into the general population without adequate protection.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Anderson asks this Court to:

1.    Declare that:

     a.     Mr. Anderson has been, and is being, deprived by Defendants of his right to be free from cruel and unusual punishment in violation of the Eighth Amendment.

     b.     Mr. Anderson has been, and is being, deprived by Defendants of his right to be free from retaliation in violation of the First Amendment.

     c.     Mr. Anderson has been, and is being, deprived by Defendants of his right to be free from discrimination on the basis of disability under the Americans with Disabilities Act and the Rehabilitation Act.

2.     Award an injunction requiring Defendants to comply with the First and Eighth Amendments, the Americans with Disabilities Act, and the Rehabilitation Act, including:

     a.     To provide Plaintiff with adequate mental health care consistent with the Eighth Amendment and in line with the recommendations of Mr. Anderson's treating mental health care providers;

     b.     To reinstate the reasonable ADA accommodations described herein;

     c.     To cease any further diagnostic changes to Mr. Anderson's treatment regime without appropriate clinical input and oversight;

     d.     To cease punitive discontinuation of clinically indicated and prescribed medication, including Ritalin, and punitive and unnecessary treatment such as force feeding;

     e.     To require disciplinary records relating to charges for which CDOC has denied mental health review of those charges to be removed and expunged from Plaintiff's CDOC file;

f.      To cease applying the "M qualifier" to limit the provision of mental health and other services, programs, and benefits to Mr. Anderson;

g.      To appoint a monitor to supervise Defendants' provision of adequate mental health care to Mr. Anderson.

h.      To acknowledge that Plaintiff, as a gang dropout, is in danger of assault and even death, and to remove the erroneous classification as a gang member from Mr. Anderson's file;

i.      To no longer place Plaintiff in living units which are known to be dangerous to him;

j.      To house Plaintiff in Protective Custody;

k.      To either (i) significantly enhance the safety measures around CSP's use of Soft Housing, including, for example, implementing procedures for investigating risks prior to inmate placement in or removal from Soft Housing; housing protected inmates in areas that allow for anonymity; and extending protections once inmates are transferred from CSP Soft Housing to general population at CSP or other CDOC facilities;  or (ii) to expand the number of units in Protective Custody housing, which units are to be used in place of Soft Housing; or (iii) to designate an entire CDOC facility—or segment thereof—for inmates in serious danger of inmate-on-inmate violence as a result of the factors described herein.

3.      Award compensatory and punitive damages for any and all violations of law as set forth herein in an amount to be determined at trial.

4.      Award any additional or alternative relief as the Court deems just and proper.

## JURY DEMAND

Mr. Anderson demands a jury trial on all claims set forth in this Complaint.

Respectfully submitted on this 19th day of October, 2020.

HOGAN LOVELLS US LLP

*s/ Nathaniel H. Nesbitt*
Nathaniel H. Nesbitt
Katy L. Bonesio
Clara C. Troyer
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
Telephone: (303) 899-7300
Fax: (303) 899-7333
nathaniel.nesbitt@hoganlovells.com
katy.bonesio@hoganlovells.com
clara.troyer@hoganlovells.com

*Court-appointed Counsel for Plaintiff Troy Anderson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of October, 2020, the foregoing **SECOND AMENDED COMPLAINT AND JURY DEMAND** was filed and served using the Court's CM/ECF system, which will serve electronic notification of this filing to all counsel of record.

*s/ Nathaniel H. Nesbitt*